```
                                          FILED
                                 CLERK, U.S. DISTRICT COURT

                                   04/09/2025

                                 CENTRAL DISTRICT OF CALIFORNIA
                                 BY: _____AP_____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2025 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>REED KYLE DIEHL,<br><br>     Defendant. | ED CR No. 5:25-cr-00116-JGB<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1344(2): Bank Fraud;<br>18 U.S.C. § 1957(a) Engaging in a<br>Monetary Transaction in Property<br>Derived from Specified Unlawful<br>Activity; 18 U.S.C. § 982:<br>Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.    Defendant REED KYLE DIEHL was a resident of Temecula, California.  Defendant DIEHL purported to be the owner of California companies named Neios Arkios LLC (Neios Arkios) and Redstar Worldwide LLC (Redstar).

2.    Bank A and Bank B were financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation.

3.    Business A was a limited liability company with a business address located in Temecula, California.  Defendant DIEHL was the Manager of Business A.

4.    The United States Small Business Administration (SBA) was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

5.    As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders.  The federal government backed these loans.

6.    The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funded forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP).

7.    To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for

unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

8.   A business's PPP loan application was received and processed, in the first instance, by a participating financial institution approved by the SBA.  If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.  The SBA guaranteed the loans funded under the PPP.

9.   PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

10.  The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan.  These "second-round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

COUNTS ONE THROUGH THREE

[18 U.S.C. § 1344(2)]

A.    THE SCHEME TO DEFRAUD

11.    Beginning on an unknown date but no later than April 18, 2020, and continuing to on or about December 17, 2021, in Riverside and Orange Counties, within the Central District of California, and elsewhere, defendant REED KYLE DIEHL, knowingly and with intent to defraud, devised, participated in, and executed a scheme to obtain monies and funds owned by, and in the custody and control of, Bank A by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.    THE FRAUDULENT SCHEME

12.    The scheme was carried out, in substance, as follows:

a.    Defendant DIEHL would submit, and cause to be submitted, online applications for first and second PPP loans on behalf of Neios Arkios and Redstar.  These applications would include certifications affirming that the funds would be used to pay the applicant's payroll expenses, mortgage interest payments, lease payments, or utility payments in accordance with the program's rules.

b.    Defendant DIEHL would electronically sign and submit Promissory Notes for each of the loans.  The Promissory Notes would contain certifications that the loan proceeds would only be used for expenses permitted under the program's rules.  Bank A would approve and fund loans totaling $114,800 to Neios Arkios and $464,014 to Redstar.

c.    Defendant DIEHL thereafter would use the loan proceeds in numerous impermissible ways, including, but not limited to, the following: (i) Pay S.M. $140,735, which S.M. believed to be the

4

proceeds from an unrelated hemp farm investment that S.M. had made with defendant DIEHL; (ii) Pay P.K. $20,769, which P.K. believed was the profit from an unrelated house-flipping business venture into which he had entered with defendant DIEHL; (iii) Make payments to an unrelated business (Business A); (iv) Make payments to R.K., also known as "R.D.," for purposes that were wholly unrelated to Neios Arkios or Redstar; and (v) Make payments to additional individuals and businesses for purposes wholly unrelated to Neios Arkios or Redstar.

C.    EXECUTION OF THE SCHEME TO DEFRAUD

13.    On or about the following dates, in Riverside and Orange Counties, within the Central District of California, and elsewhere, defendant DIEHL, for the purpose of executing the above-described scheme to defraud, committed the following acts, each of which constituted an execution of the fraudulent scheme:

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| ONE | April 28, 2020 | Submitted fraudulent Promissory Note to Bank A regarding a PPP loan to Neios Arkios in the amount of $57,400. |
| TWO | May 16, 2020 | Submitted fraudulent Promissory Note to Bank A regarding a PPP loan to Redstar in the amount of $226,400. |
| THREE | March 4, 2021 | Submitted fraudulent Promissory Note to Bank A regarding a PPP loan to Neios Arkios in the amount of $57,400. |

1                        COUNT FOUR

2                  [18 U.S.C. § 1344(2)]

3    A.    THE SCHEME TO DEFRAUD

4         14.    Beginning in or around November 2021, and continuing

5    through at least on or about April 19, 2023, in Riverside County,

6    within the Central District of California, and elsewhere, defendant

7    REED KYLE DIEHL, knowingly and with intent to defraud, devised,

8    participated in, and executed a scheme to obtain monies and funds

9    owned by and in the custody and control of Bank B by means of false

10   and fraudulent pretenses, representations, and promises, and the

11   concealment of material facts.

12   B.    THE FRAUDULENT SCHEME

13        15.    The scheme was carried out, in substance, as follows:

14        a.    Defendant DIEHL would solicit victims J.B.L. and

15   J.F.L. to provide a three-month loan to Business A, an entity whose

16   bank accounts' defendant Diehl controlled.

17        b.    To convince victims J.B.L. and J.F.L. to provide the

18   requested loan, Defendant DIEHL would falsely represent to victims

19   J.B.L. and J.F.L. that the loan proceeds would be used for legitimate

20   expenses of Business A, and that defendant DIEHL would provide

21   documentation to victims J.B.L. and J.F.L. to demonstrate how the

22   loan was used.

23        c.    Victims J.B.L. and J.F.L. would send two separate

24   $175,000 wire transfers to Business A's bank account.

25        d.    Defendant DIEHL would send victim J.B.L. a fraudulent

26   bank statement for Business A, which displayed only expenses which

27   appeared legitimate.

28

                                6

e.    Despite his agreement to do so, Defendant DIEHL would not send victims J.B.L. and J.F.L. Business A's actual bank account statement, which would have revealed transfers from Business A's bank account to Defendant DIEHL's personal bank account, and an in-bank withdrawal of money from Business A's bank account.

f.    Defendant DIEHL would use victims J.B.L. and J.F.L.'s money to pay for, amongst other things, groceries, utilities, luxury hotel stays (located in Marina Del Ray, California, Rancho Mirage, California, and Los Cabos, Mexico), airfare, expenses at restaurants, and purchases at Nieman Marcus.

C.    <u>EXECUTION OF THE SCHEME TO DEFRAUD</u>

16.    On or about January 13, 2022, in Riverside County, within the Central District of California, and elsewhere, defendant DIEHL, for the purpose of executing the above-described scheme to defraud, made a point of sale purchase in Rancho Mirage, California, in the amount of $692.84.

1

COUNT FIVE

2

[18 U.S.C. § 1957]

3       On or about May 29, 2020, in Riverside County, within the

4  Central District of California, and elsewhere, defendant REED KYLE

5  DIEHL, knowing that the property involved in the monetary transaction

6  represented the proceeds of some form of unlawful activity, knowingly

7  engaged in a monetary transaction involving criminally derived

8  property of a value greater than $10,000 by sending a wire transfer

9  of approximately $140,735 from a Neios Arkios bank account ending in

10  1638 to a bank account held in the name of S.M., which property, in

11  fact, was derived from specified unlawful activity, namely, bank

12  fraud, in violation of Title 18, United States Code, Section 1344(2),

13  as charged in Count Two.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT SIX

[18 U.S.C. § 1957]

On or about June 4, 2020, in Riverside County, within the Central District of California, and elsewhere, defendant REED KYLE DIEHL, knowing that the property involved in the monetary transaction represented the proceeds of some form of unlawful activity, knowingly engaged in a monetary transaction involving criminally derived property of a value greater than $10,000 by issuing a check from a Neios Arkios bank account ending in 1638 in the amount of approximately $20,769 payable to P.K., which property, in fact, was derived from specified unlawful activity, namely, bank fraud, in violation of Title 18, United States Code, Section 1344(2), as charged in Count Two.

1                    FORFEITURE ALLEGATION ONE

2                       [18 U.S.C. § 982]

3        1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 982(a)(2), in the event of the

7   defendant's conviction of the offenses set forth in any of Counts One

8   through Four of this Indictment.

9        2.    The defendant, if so convicted, shall forfeit to the United

10  States of America the following:

11            a.    All right, title, and interest in any and all

12  property, real or personal, constituting, or derived from, any

13  proceeds obtained, directly or indirectly, as a result of the

14  offense; and

15            b.    To the extent such property is not available for

16  forfeiture, a sum of money equal to the total value of the property

17  described in subparagraph (a).

18       3.    Pursuant to Title 21, United States Code, Section 853(p),

19  as incorporated by Title 18, United States Code, Section 982(b), the

20  defendant, if so convicted, shall forfeit substitute property, up to

21  the total value of the property described in the preceding paragraph

22  if, as the result of any act or omission of said defendant, the

23  property described in the preceding paragraph, or any portion

24  thereof: (a) cannot be located upon the exercise of due diligence;

25  (b) has been transferred, sold to or deposited with a third party;

26  (c) has been placed beyond the jurisdiction of the court; (d) has

27  been substantially diminished in value; or (e) has been commingled

28  with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the defendant's conviction of the offenses set forth in any of Counts Five and Six of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

a. Any property, real or personal, involved in such offense, and any property traceable to such property; and

b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

1  course of the money laundering offense unless the defendant, in

2  committing the offense or offenses giving rise to the forfeiture,

3  conducted three or more separate transactions involving a total of

4  $100,000.00 or more in any twelve-month period.

5

6                              A TRUE BILL

7

8                              _____/S/_____

9                              Foreperson

10  BILAL A. ESSAYLI
    United States Attorney
11

12  *Lindsey Greer Dotson*

13  LINDSEY GREER DOTSON
    Assistant United States Attorney
14  Chief, Criminal Division

15  SEAN D. PETERSON
    Assistant United States Attorney
16  Chief, Riverside Branch Office

17  BENJAMIN J. WEIR
    Assistant United States Attorney
18  Riverside Branch Office

19

20

21

22

23

24

25

26

27

28

                              12